IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KONOVER CONSTRUCTION CORP.        *
n/k/a KBE BUILDING CORP.
                                  *

          Plaintiff              *

            vs.                  *   CIVIL ACTION NO. MJG-10-2801

ATC ASSOCIATES INC.,             *
et al.
            Defendant            *

*       *       *       *       *       *       *       *       *

<u>MEMORANDUM AND ORDER</u>

The Court has before it Defendant Massachusetts Bay

Insurance Company's Motion for Summary Judgment and Request for

Hearing [Document 77], Defendant ATC Associates Inc.'s Motion to

Dismiss Second Amended Complaint [Document 78], and documents

related thereto.  The Court has held a hearing and had the

benefit of the arguments of counsel.


I.   <u>BACKGROUND</u>[1]

In 2001, Wal-Mart contracted with Plaintiff, Konover

Construction Corporation n/k/a KBE Building Corporation ("KBE")

to build a Wal-Mart store and a Sam's Club store in Port

Covington, Maryland.  The contract documents provided extensive

project specifications (the "Specifications").  KBE subsequently

---

[1]   The "facts" herein are as alleged by Plaintiff and are not
necessarily agreed upon by Defendants.

entered into a subcontract with Defendant Superus, Inc., ("Superus") which provided that Superus would construct the concrete masonry walls of the Wal-Mart and Sam's Club stores. As required by its contract with KBE, Superus purchased an insurance policy from Defendant Massachusetts Bay Insurance Company ("Massachusetts Bay"), and named KBE as an "additional insured" on that policy.

In connection with the construction, Wal-Mart contracted with ATC Associates, Inc. ("ATC") to independently test and inspect the concrete, structural steel, and masonry of the buildings' compliance with the Specifications.

Construction on the Wal-Mart and Sam's Club stores took place in late 2001 and early 2002. Superus constructed the masonry walls, and while they did so, ATC's engineers prepared daily reports summarizing their test results and observations, which were transmitted to both Wal-Mart and KBE. ATC's daily reports from November 2001 to January 2002 contain representations that the concrete, masonry, grout, and vertical and horizontal steel reinforcing assemblies were placed in compliance with the projects' Specifications.

Construction on both stores was completed and both buildings were occupied in 2002. By 2007, a large crack appeared in the construction joint on an exterior wall of the Wal-Mart store. Wal-Mart investigated the crack and determined

that it was caused by "latent and observable construction deficiencies." Second Am. Compl. ¶ 26. Wal-Mart also noted property damage including "step pattern cracks" on an exterior wall, cracks in the building's concrete footings, uneven slabs, and a crack on the interior floor. These construction deficiencies and other related property damage will collectively be referred to as "Problems."

In November 2007, Wal-Mart notified KBE of the Problems. Wal-Mart hired a consulting firm to conduct follow-up thermographic studies to document the Problems. The firm produced a report which concluded that the Problems consisted primarily of (1) voids or foam in the concrete block surrounding the reinforcing steel in areas that should have been filled with grout; and (2) in limited circumstances, reinforcing steel was missing or not installed in accordance with the Specifications; and (3) the spacing of the walls did not conform to the Specifications.

As the investigation into the Wal-Mart store Problems progressed, Wal-Mart and KBE determined that the Sam's Club store also suffered from Problems. According to KBE, the Wal-Mart and Sam's Club Problems "decreased the capacity of the exterior masonry walls to resist out-of-plane wind loads in violation of the Baltimore City Building Code" and "compromised

the structural integrity of the Wal-Mart and Sam's Club buildings in their entirety."  Second Am. Compl. ¶¶ 32-33.

KBE completed and paid for the repair and remediation of the Problems.  In 2008, Wal-Mart and KBE entered into a settlement agreement and release (the "2008 Settlement") resolving any and all claims by Wal-Mart against KBE relating to the Wal-Mart store Problems upon KBE's repair thereof.  In 2009, Wal-Mart and KBE entered into a similar settlement agreement with respect to the Sam's Club store (the "2009 Settlement"). The 2008 and 2009 Settlements contained assignment clauses whereby Wal-Mart assigned to KBE all of Wal-Mart's rights and interests in claims against ATC.

KBE filed the Complaint in the instant case in October 2010.  In December 2010, ATC filed a motion to dismiss the Complaint [Document 11] arguing that KBE's claims against ATC failed as a matter of law because Wal-Mart had no valid claims against ATC to assign because KBE had remediated all of the Problems.  While the dismissal motion was pending, in January 2011, KBE and Wal-Mart signed two additional agreements superseding the 2008 Settlement and 2009 Settlement, (the "2011 Novation Agreements").  The purpose of the 2011 Novation Agreements was to provide KBE enforceable rights against ATC and Superus.  To achieve this end, the 2011 Novation Agreements eliminated the assignment of rights provided in the 2008 and

2009 Agreements and was intended to provide KBE with contribution rights against ATC and Superus.

On January 21, 2011, KBE filed the Amended Complaint [Document 21] that was thereafter superseded by the currently pending Second Amended Complaint [Document 73] filed June 24, 2011.

In the Second Amended Complaint, KBE presents claims in fourteen Counts against ATC, Superus and Massachusetts Bay.

Defendant ATC:

      I.       Negligence

      II.      Negligent misrepresentation

      III.     Fraud

      IV.      Indemnity

      V.       Contribution

Defendant Superus:

      VI.      Breach of contract (Construction)

      VII.     Breach of contract (Insurance related)

      VIII.    Negligence

      IX.      Unjust enrichment

      X.       Indemnity

      XI.      Contribution

      XII.     Breach of contract (Indemnification)

Defendant Massachusetts Bay:

      XIII.   Declaratory judgment (Coverage)

XIV.    Breach of Contract (Coverage)

By the instant motions, Massachusetts Bay seeks summary judgment and ATC seeks dismissal of all claims against it.


III. LEGAL STANDARDS

A.    Summary Judgment Standard

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  The Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus, in order to defeat a motion for summary judgment, "the party opposing the

motion must present <u>evidence</u> of specific facts from which the finder of fact could reasonably find for him or her." <u>Mackey v. Shalala</u>, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).

When evaluating a motion for summary judgment, the Court must bear in mind that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex</u>, 477 U.S. at 327 (quoting Rule 1 of the Federal Rules of Civil Procedure).

> B.   <u>Motion to Dismiss Standard</u>

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (citations omitted).  When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff.

However, conclusory statements or a "formulaic recitation of the elements of a cause of action" will not suffice.  <u>Id.</u>  A

complaint must allege sufficient facts to "cross 'the line between possibility and plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Thus, if the well-pleaded facts contained within a complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009)) (internal quotation marks omitted).

IV.  DISCUSSION

A.  Massachusetts Bay's Motion For Summary Judgment

KBE seeks to recover from Massachusetts Bay, as an additional insured, for the costs it incurred in remedying the Problems caused by Superus' defective work.  These included the costs of repairing Superus' own defective work as well as, according to KBE, collateral and/or resulting damage caused by Superus' defective work.

As discussed herein, Massachusetts Bay contends that there was no duty to indemnify for repairing Superus' own defective

work, there is no evidence adequate to establish that Superus'

defective work caused any collateral and/or resulting damage

that was not subject to an Impaired Property exclusion, and

that, in any event, no damage occurred during the Policy period.


    1.   The Insurance Policy

        Massachusetts Bay issued Businessowners Policy Number

ODT-572520100 to Superus which was in effect only from November

5, 2001 to February 10, 2002.[2]

    The Policy, which the parties agree is to be construed

pursuant to the law of Arkansas, provides in pertinent part:

            a. We will pay those sums that the insured becomes
               legally obligated to pay as damages because of
               "bodily injury", "property damage", "personal
               injury", or "advertising injury" to which this
               insurance applies.  . . .

            b. This insurance applies:

                1.  To "bodily injury" and "property
                    damage" only if:

                        a. The "bodily injury" or "property
                           damage" is caused by an "occurrence"
                           that takes place in the "coverage
                           territory"; and
                        b. The "bodily injury" or "property
                           damage" occurs during the policy
                           period.

Mot. Summ. J. Ex. 10.

---

[2]    The policy was issued for the period of November 5, 2001 to
November 5, 2002 but was cancelled effective February 10, 2002
for nonpayment of premium.

The Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. "Accident" is not defined in the Policy, however, "'accident' is usually defined as an event that takes place without one's foresight or expectation - an event that proceeds from an unknown cause, and therefore not expected." Essex Ins. Co. v. Holder, 261 S.W.3d 456, 458 (Ark. S.C. 2008).

"Property damage" is defined in the Policy as:

    a.    Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Mot. Summ. J. Ex. 10.

KBE is an additional insured on the Policy, which is modified by a Businessowners Liability Special Broadening Endorsement providing that "any person or organization with whom you agreed, because of a written contract . . . is an insured . . . with respect to . . . 'Your work' for the additional insured(s)." Id.

The Impaired Property Exclusion precludes coverage for the cost of repairing the insured's defective work:

A.   Exclusions

1.    . . . This insurance does not apply to:

. . .

n.   Damage to Impaired Property or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)  A defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or

(2)  A delay or failure by you or anyone on your behalf to perform a contract or agreement in accordance with its terms.

Id.

"Impaired property" is defined as:

7.   "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:

a.   It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b.   You have failed to fulfill the terms of your contract or agreement; if such property can be restored to use by:

(1)  The repair, replacement, adjustment, or removal of "your product" or "your work"; or

(2)  Your fulfilling the terms of the contract or agreement.

11

Id.

      2.   Relevant Legal Principles

The Arkansas Supreme Court has held that defective workmanship, standing alone and resulting in damages only to the work product itself, is not an "occurrence" under a similar insurance policy. Essex Ins. Co. v. Holder, 261 S.W.3d 456, 459-60 (Ark. S.C. 2008) ("Faulty workmanship is not an accident; instead, it is a foreseeable occurrence, and performance bonds exist in the marketplace to insure the contractor against claims for the cost of repair or replacement of faulty work.").

However, collateral or resultant damage to property other than the work product itself is covered. See Lexicon, Inc. v. ACE Am. Ins. Co., 634 F.3d 423, 426-27 (8th Cir. 2010) (applying Arkansas law) (where insured contracted to build a storage silo that later collapsed because of faulty welds by one of its subcontractors, there was no coverage for damage to the work product itself, the silo, but the policy did cover collateral damage to nearby equipment and the metal pellets that were stored in the silo); see also Advanced Envtl. Recycling Techs. Inc. v. Am. Int'l Specialty Lines, Ins. Co., 399 Fed. Appx. 869, *10 (5th Cir. 2010) (Holder "stands for the proposition that shoddy work . . . which then fails without collateral damage to a person or other property is not an 'accident' from the

standpoint of the insured"); <u>French v. Assurance Co. of Am.</u>, 448
F.3d 693, 706 (4th Cir. 2006); <u>Harbor Court Assocs. v. Kiewit
Construction Co.</u>, 6 F. Supp. 2d 449, 452 (D. Md. 1998) (Garbis,
J.).


### 3.   Superus' Own Defective Work

It is clear under Arkansas law, and the parties appear to
agree,[3] that Massachusetts Bay is not obligated to indemnify KBE
for any repairs to the masonry walls themselves, including any
cracks or gaps in the walls.  <u>See</u> <u>Holder</u>, 261 S.W.3d at 460.


### 4.   Allegedly Resultant Property Damage

KBE's argument that it is entitled to indemnification for
any alleged resulting and/or collateral property damage does not
prevail.

As discussed herein: (1) KBE is not entitled to
indemnification on the ground that the defective walls caused a
building code violation and compromised the structural integrity
of the building, (2) there is no evidence adequate to prove that
any allegedly resultant property damage was caused by Superus'
faulty construction of the walls, and (3) KBE has not presented

---

[3]    KBE concedes in its Opposition that "the cost of repairing
the faulty work product, itself, is not an 'occurrence.'"  Opp'n
Mot. Dismiss 14.

evidence adequate to prove that the Settlement Agreements

covered the remediation of collateral damage.


                    a.    Building Code Violation

     According to KBE, the defective masonry walls "decreased

the capacity of the exterior masonry walls to resist out-of-

plane wind loads in violation of the Baltimore City Building

Code" and "compromised the structural integrity of the Wal-Mart

and Sam's Club buildings in their entirety."   Second Am. Compl.

¶¶ 32-33.   The Policy covers "property damage" ("physical injury

to tangible property" including resulting loss of use) that is

cause by an "occurrence."   See Mot. Summ. J. Ex. 10.

     The Court finds the reasoning of the Seventh Circuit

persuasive:

> [W]here property damage is defined as "tangible"
> property damage; some actual injury to "tangible"
> property must be alleged before consequential damages
> such as loss of use may be recovered.   "For example,
> if an automobile crash results from the failure of its
> defective tire, the defective component can be said to
> have caused 'property damage' to the finished product.
> If, however, some of the tires purchased by the
> automobile manufacturer are found to be defective and
> the manufacturer therefore withdraws its cars from the
> market, there has not been 'injury to or destruction
> of tangible property,' which is (as noted) the
> definition of 'property damage' in the policy."

Dreis & Krump Mfg. Co. v. Phoenix Ins. Co., 548 F.2d 681, 687

(7th Cir. 1977) (quoting Hamilton Die Cast, Inc. v. United

States Fidelity & Guaranty Co., 508 F.2d 417 (7th Cir. 1975).

By this logic, the building code violation caused by the allegedly defective walls is not covered "property damage," although it could be evidence of a defect that threatened to cause such damage.

Moreover, even if the building code violation and structural integrity problem were "property damage," insurance coverage would be barred by the Impaired Property Exclusion. The Policy does not provide coverage for "property damage" to property other than Superus' masonry walls ("impaired property") that is less useful because it incorporates Superus' defective work product if such property can be restored to use by the repair or replacement of Superus' masonry walls.  See Mot. Summ. J. Ex. 10.  Because the building code violation and structural integrity issues were resolved by repairs to the masonry walls, the coverage for these repairs is barred by the Impaired Property Exclusion.

### b.   Proof of Causation

KBE argues that the cracked footing, cracked and uneven slab, crack in the interior floor finish, and ponding of roof run-off were "resultant" property damages remediated by KBE that should be covered by the Massachusetts Bay Policy.

KBE has shown that these other building defects were observed.  KBE attached two reports prepared by consulting firms

to its Sur-Reply Motion [Document 85].  These reports enumerate the defects in the walls, footing, slabs, and roof that were observed at the Wal-Mart store in 2007 and 2008.  The first consultant report, dated March 24, 2008, notes that "a foundation settlement occurred at the Port Covington Wal-Mart store" and that "Rimkus Consulting Group was retained to determine the cause and origin of the reported damage."  Sur-Reply Ex. A.

However, despite being done by experts retained to determine the cause of the damage, neither report links the defects in the footing, slabs, and roof to the faulty construction of the walls.  The consulting reports leave open the possibility that at least the slab problems - inadequate thickness of the concrete slab flooring - were related to the work of other subcontractors.  KBE does not identify whether the cracked footing was Superus' work or the work of another subcontractor; if it was Superus' work, it is not a covered "occurrence"; if it is the work of another contractor, there is no evidence to show that the cracked footing was collateral damage caused by Superus' defective walls.  So too with the roof drainage problems.

At the hearing, when confronted with the absence of evidence tying these allegedly resultant defects to the defective walls, counsel for KBE conceded that the expert

reports "are not saying there is a specific link at this time," but argued that "another expert report can be obtained" to show evidence of causation.  Hr'g Tr. Oct. 28, 2011 at 24-25.

Rule 56(e)(2)[4] requires a party opposing summary judgment to set forth specific facts showing a general issue for trial:

> (2)  Opposing Party's Obligation to Respond:
>
>> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on the allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2).

As is often noted, summary judgment proceedings provide the "put up or shut up" moment in litigation.  <u>Everroad v. Scott Truck Sys.</u>, 604 F.3d 471, 476 (7th Cir. 2010).  KBE has not put up evidence adequate to permit a finding of causation


c.   <u>Settlement Agreements Content</u>

Even if the allegedly collateral damages were not subject to exclusion from the Policy and if KBE showed that such conditions were caused by Superus' faulty wall construction, there is no evidence that the settlement agreements required KBE

---

[4]   All "Rule" references herein refer to the Federal Rules of Civil Procedure.

to remediate those problems.  The parties agree that the "existence of coverage depends on what claims were settled."  In re Feature Realty Litigation, 468 F. Supp. 2d 1287, 1296 (E.D. Wash. 2006).  The settlement agreements specify that the deficiencies to be repaired are set forth in the Thermograph Report "and consist primarily of voids or foam in the concrete block surrounding the reinforcing steel in areas that should have been filled with grout and, in limited circumstances, missing or incorrectly-installed reinforcing steel."  See Second Am. Compl. Exs. C & D.  Thus, the settlement agreements refer solely to remediating Superus' allegedly defective work.

KBE asks this Court to consider its conduct in remediating the defects and not just the words of the Settlement Agreements. KBE has averred that the remediation actually done included repair of the "other property damage" to the two stores.  Second Am. Compl. ¶ 39.  However, KBE has not provided evidence adequate to establish this alleged fact.


5.   Policy Period

Although the matter is moot, it appears that KBE has not offered evidence adequate to establish that the claimed damages occurred during the policy period, which was November 5, 2001, to February 10, 2002.

It is undisputed that Wal-Mart notified KBE of the Problems some five and a half years after the end of the Policy period.

The parties disagree as to the application of the "injury-in-fact" approach to determine when the Policy is triggered.

Massachusetts Bay contends that insurance policies are triggered under this approach on the date the actual injury and damages occur.  See Transcon. Ins. Co. v. W.G. Samuels Co., Inc., 370 F.3d 755, 759-60 (8th Cir. 2004) (applying Kansas law and finding that the date that carpet became detached from floor, rather than date when insured installed carpet, was relevant date for determining "occurrence" and "property damage").

KBE argues that the structural deficiencies and resulting violations of the building code occurred concurrently with construction, and therefore the resulting damages occurred during the policy period, although they did not manifest until several years later.

The Eighth Circuit has stated:

"[We do not] say that the date of a company's breach of contract or warranty, or its negligent workmanship, could never be the date when actual injury occurs for purposes of the insurance policy.  If physical injury to tangible property occurred at moment of the faulty workmanship, as in Baugh Const. Co. v. Mission Ins. Co., 836 F.2d 1164, 1170 (9th Cir. 1988), such that the insured's work product and other tangible property affected by the work product were "doomed" and useless immediately, then the property damage and the

negligence or breach of contract and warranty may be
simultaneous.

Id. at 759 (citing cases).  See also French v. Assurance Co. of
Am., 448 F.3d 693, 696, 706 (4th Cir. 2006) (holding CGL policy
provided liability coverage for cost to remedy collateral
property damage to interior of home caused by subcontractor's
defective workmanship to exterior of home where extensive water
damage was discovered more than five years after construction).

According to KBE, the walls and related building elements
were doomed as soon as Superus made its construction errors, and
thus, occurred "during the policy period."  Whether the
buildings were "useless immediately," see Transcon., 370 F.3d at
759, as claimed by KBE, is a moot issue, because, as addressed
above, Massachusetts Bay is entitled to summary judgment on
other grounds.

   B.   ATC MOTION TO DISMISS

As noted above, KBE asserts claims against ATC on theories
of negligence , negligent misrepresentation, fraud, indemnity,
and contribution.

   1.   Negligence and Negligent Misrepresentation[5]

---

[5]   These claims will be considered together, because as
acknowledged by counsel for KBE at the hearing, these claims are
essentially indistinct.  Hr'g Tr. Oct. 28, 2011 at 43-44.

a.  <u>Inconsistency</u>

It is true that KBE is pleading inconsistently when asserting a claim for negligence based on its not being contributorily negligent and a claim that it and ATC were joint tortfeasors based on its being negligent.  However, a party is expressly permitted to plead alternative, mutually inconsistent, claims.[6]

b.  <u>Adequacy</u>

In Count I, KBE claims that ATC was negligent because ATC breached its duty to KBE to provide thorough and accurate inspection and testing services.  In Count II, KBE claims that ATC negligently made daily reports about the quality and accuracy of construction that were materially false and which KBE relied upon to its detriment.

A sufficient pleading in a negligence action must "'allege, with certainty and definiteness, facts and circumstances sufficient to set forth (a) a <u>duty</u> owed by the defendant to the plaintiff, (b) a <u>breach</u> of that duty and (c) injury <u>proximately</u> resulting from that breach.'"  <u>Read Drug and Chem. Co. v.</u>

---

[6]   In a complaint, a party may make alternative claims, regardless of consistency.  Fed. R. Civ. P. 8(d)(2)-(3).  In the instant case, it appears likely that as the facts and legal theories are developed through discovery, KBE's claims may narrow.

Colwill Constr. Co., 243 A.2d 548, 553 (Md. 1967) (emphasis in original).

To assert a claim for negligent misrepresentation, a plaintiff must allege:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;
>
> (4) the plaintiff, justifiably, takes action in reliance on the statement; and
>
> (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

Lloyd v. GMC, 916 A.2d 257, 273 (Md. 2007) (quoting Virginia Dare Stores v. Schuman, 1 A.2d 897, 899 (Md. 1938)).  A common element to both claims is a duty of care.

ATC argues that these claims are barred because ATC did not owe a tort duty to KBE and because KBE was contributorily negligent as a matter of law.


c.   Tort Duty

KBE has adequately pleaded that ATC owed KBE a duty of care that would give rise to an action in negligence.

ATC's failure to exercise due care in its inspection of the masonry walls created only a risk of economic loss for KBE.[7] Economic losses include the loss of value or use of the product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of use of the product.  A.J. Decoster Co. v. Westinghouse Elec. Corp., 634 A.2d 1330, 1332 (Md. 1994).

In such a case, Maryland courts require "an intimate nexus between the parties as a condition to the imposition of tort liability."  Jacques v. First Nat'l Bank, 515 A.2d 756, 759-60 (Md. 1986).  The nexus requirement is satisfied by contractual privity "or its equivalent."  Id.  ("By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability.").

In Jacques, the Maryland Court of Appeals contrasted two cases to demonstrate the nexus requirement.  In the first case, Glanzer v. Shepard, 135 N.E. 275 (1922) (Cardozo, J.), the issue was whether a public weigher of beans, engaged and paid only by the seller, was liable to the buyer of the beans for negligence in the weighing.  The Jacques court explained that "the buyer,

---

[7]   KBE, itself, was not at any risk of physical injury from the allegedly defective walls, unlike Wal-Mart or Wal-Mart's customers, who are discussed below in the context of the indemnity claim.

although having no contract with the weigher, was the known and intended beneficiary of the contract between the seller and the weigher, and therefore a beneficiary of the duty owed by the weigher." 515 A.2d at 760.

In the second case, Ultramares Corp. v. Touche, 174 N.E. 441, 442 (1931), an accounting firm prepared and certified a balance sheet to a corporation, who used the balance sheet for various purposes, including to obtain financing from the plaintiff. When the corporation failed to pay its obligation to the plaintiff, the plaintiff sued the accounting firm. Id. The court held that the accountants were not liable in negligence to a third party who made loans to the corporation in reliance on the balance sheet. Id. at 450. The Jacques court explained that unlike in Glanzer, "there was no 'contractual relation or even one approaching it, at the root of any duty that was owing from the defendants . . . to the indeterminate class of persons who . . . might deal with the [corporation] in reliance on the audit.'" 515 A.2d at 760 (quoting Ultramares, 174 N.E. at 446)).

The Maryland courts have further explored this nexus requirement. In Weisman v. Connors, 540 A.2d 783 (Md. 1987), the Maryland Court of Appeals considered whether a prospective employer owed a prospective employee a duty of care in pre-contractual employment negotiations for representations that

24

lead the prospective employee to believe that there would be certain benefits to joining the prospective employer.  The court opined:

> In this regard, the face-to-face pre-contractual discussions between Weisman and Connors more closely resemble the intimacy of the Glanzer parties than the remoteness of the Ultramares relationship. As in Glanzer, Weisman could reasonably foresee the probable consequences of negligence in his negotiations with Connors. And there was no question as in Ultramares, of 'liability in an indeterminate amount for an indeterminate time to an indeterminate class.'

540 A.2d at 793.

In Walpert, Smullian & Blumenthal, P.A. v. Katz, 762 A.2d 582, 592 (Md. 2000), the Maryland Court of Appeals synthesized the rule that emerged from these and other precedential cases:

> From the foregoing, the rationale underlying the requirement of privity or its equivalent as a condition of liability for negligent conduct, including negligent misrepresentations, resulting in economic damages emerges: to avoid "liability in an indeterminate amount for an indeterminate time to an indeterminate class." Ultramares, 255 N.Y. at 179, 174 N.E. at 444. Stated differently, the reason for the requirement is to limit the defendant's risk exposure to an actually foreseeable extent, thus permitting a defendant to control the risk to which the defendant is exposed. It was that concern that was being addressed by the Jacques Court when it juxtaposed Glanzer and Ultramares and stressed doubly that the Jacqueses were not strangers to the loan transaction and that the Bank promised the Jacqueses to process their loan application and to lock in a certain rate of interest for a period of time. Jacques, at 537, 515 A.2d at 761.

762 A.2d at 596.  Stated otherwise, "The common denominator of the Maryland cases, where no contractual privity existed but

nevertheless a tort was found, is that in each case the
relationship of the litigants was close enough that the
defendant knew that the plaintiff was likely to take some action
based on what the defendant said or did." Simmons v. Lennon,
773 A.2d 1064, 1079 (Md. Ct. Spec. App. 2001).

In the instant case, KBE has alleged that ATC transmitted
its daily testing and inspection reports of the Wal-Mart and
Sam's Club Projects directly to KBE.  Here, although there is no
contractual privity between KBE and ATC, the relationship
between the parties was close.  ATC was required to submit
laboratory quality assurances to a limited number of parties
based on its contract with Wal-Mart.  See Opp'n Mot. to Dismiss
Ex. B, Specification § 01458 at 1.5(A)-(B) (e.g., "Building
Testing and Inspection: . . . distribute report . . . as
follows: (a) Wal-Mart Construction Manager: 1 copy. (b)
Contractor: 3 copies. (c) Building Official: Quantities as
required.).  This relationship was similar to the "face-to-face"
relationship in Weisman, which gave rise to a tort duty because
the defendant could reasonably foresee the probable consequences
of his negligence.  See 540 A.2d at 793.  The relationship
between ATC and KBE was close enough that it is plausible to
contend that ATC was aware that KBE was likely to take some
action based on its reports.  Thus, for purposes of the instant

motion, KBE has pleaded a plausible claim that there was a duty of care.

ATC argues, based on the language of KBE's contract with Wal-Mart, that ATC and/or Wal-Mart did not intend KBE to rely on its reports, that neither of them knew that KBE would so rely, and that it was unreasonable for KBE to do so.  While these arguments may be worthy of consideration at the summary judgment stage, on the face of the Complaint KBE has made a plausible claim.

### d.   Contributory Negligence

Under Maryland law, contributory negligence of a plaintiff will ordinarily bar its recovery.  Board of County Comm'rs. v. Bell Atlantic-Maryland, 695 A.2d 171, 181 (Md. 1997).

ATC cites no cases for the proposition that KBE is contributorily negligent as a matter of law based on the negligent acts of its subcontractor.  KBE, on the other hand, has cited Klein v. Dougherty, 87 A.2d 821, 825 (Md. App. 1952), for the proposition that a general contractor is not liable for contributory negligence for failing to inspect the work of a subcontractor who was in the business of doing such work and no reason existed for the general contractor to believe the subcontractor's work was deficient.

The Court finds that there is a plausible claim by KBE that ATC will not be able to carry its burden of proving that KBE was contributorily negligent.  Cf. Campbell v. Balt. Gas & Elec. Co., 619 A.2d 213, 216 (Md. Ct. Spec. App. 1993).


       2.   Fraud

In Count III, KBE asserts a cause of action for fraud against ATC for making material false factual representations to KBE regarding the quality and accuracy of construction of the walls.

In Maryland, to prevail on a claim for fraud, a plaintiff must show:

> (1) that the defendant made a false representation to the plaintiff,
>
> (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth,
>
> (3) that the misrepresentation was made for the purpose of defrauding the plaintiff,
>
> (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and
>
> (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

Gourdine v. Crews, 405 Md. 722, 758 (Md. 2008).

Fraud claims are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  Haley v. Corcoran, 659 F. Supp. 2d 714, 724 n.10 (D. Md. 2009).  Rule

9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  The "circumstances" include "'the time, place, and contents of . . . false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1297 (2d ed. 1990)).  "Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of defendant's intent to deceive."  Id. (citing 5 Wright & Miller § 1297).  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial and (2) that plaintiff has substantial prediscovery evidence of those facts."  Harrison, 176 F.3d at 784.

KBE has satisfied the pleading standard for fraud.  KBE has sufficiently alleged the circumstances of the false inspection reports.  Second Am. Compl. ¶¶ 21–23, 30, 67–69.  While KBE has done no more than provide conclusory allegations of defendant's intent to deceive, these conclusory allegations satisfy the

pleading requirements at this stage.  Harrison, 176 F.3d at 784.
As was noted by counsel for KBE at the hearing, under the facts
alleged in the complaint, it is possible that the ATC employees
intentionally submitted false reports.  See Hr'g Tr. Oct. 28,
2011 at 46.

While KBE's fraud claim may not now appear likely to have
merit, it is above the "plausibility" line.


   3.   Indemnity

KBE's indemnity claim is premised on a negligence theory.
KBE claims that if it was negligent, its negligence was passive,
whereas ATC's negligence was active; KBE was required to
compensate Wal-Mart, and KBE is therefore entitled to
indemnification from ATC.  Second Am. Compl. ¶¶ 79-85.

"A party has a right to tort-based indemnification when,
without personal fault, it has become subject to tort liability
for the unauthorized and wrongful conduct of another."  Royal
Ins. Co. v. Miles & Stockbridge, P.C., 133 F. Supp. 2d 747, 771
(D. Md. 2001) (internal quotation marks omitted).  A passively
negligent tortfeasor has a right to indemnification from an
actively negligent tortfeasor.  Max's of Camden Yards, L.L.C. v.
A.C. Beverage, Inc., 913 A.2d 654, 660 (Md. Ct. Spec. App.
2006).

For this theory to apply, KBE must be liable in tort to
Wal-Mart, such that KBE and ATC were joint tortfeasors.[8]  For KBE
to have tort liability, there must be an independent basis in
the law for KBE's duty to Wal-Mart.  "A contractual duty, by
itself, does not create a tort duty.  Instead, the duty giving
rise to a tort action must have some independent basis."  Jones
v. Hyatt Ins. Agency, Inc., 356 Md. 639, 653 (Md. 1999).  "The
mere negligent breach of a contract, absent a duty or obligation
imposed by law independent of that arising out of the contract
itself is not enough to sustain an action sounding in tort. . .
. it is only when a breach of contract is also a violation of a
duty imposed by law that the injured party has a choice of
remedies."  Heckrotte v. Riddle, 224 Md. 591, 595-96 (Md. 1961).

Maryland recognizes a tort duty of care arising from
contractual dealings with professionals:

> An additional factor relevant to the determination of
> whether to recognize the existence of a tort duty is
> the nature of the business of the party upon whom the
> burden is sought to be imposed. . . . The law
> generally recognizes a tort duty of due care arising
> from contractual dealings with professionals such as
> physicians, attorneys, architects, and public
> accountants. Additionally, we have recognized that in
> those occupations requiring peculiar skill, a tort

---

[8]   The economic loss doctrine does not bar KBE or ATC's
liability in tort to Wal-Mart, because both parties were in
contractual privity with Wal-Mart.  See Jacques v. First Nat'l
Bank, 515 A.2d 756, 759-60 (Md. 1986) ("if the risk created by
negligent conduct is not greater than one of economic loss,
generally no tort duty will be found absent a showing of privity
or its equivalent").

    duty to act with reasonable care will be imposed on
    those who hold themselves out as possessing the
    requisite skill.

Jacques v. First Nat'l Bank, 515 A.2d 756, 763 (Md. 1986).

     Maryland has also acknowledged the general rule of
liability where the result of negligence is the creation of a
dangerous condition.  Walpert, Smullian & Blumenthal, P.A. v.
Katz, 762 A.2d 582, 592 (Md. 2000).  The Maryland Court of
Appeals has held that builders and architects have a tort duty
"to use due care in the design, inspection, and construction of
a building" to those with whom they contract to build, as well
as "to those persons foreseeably subjected to the risk of
personal injury because of a latent and unreasonably dangerous
condition resulting from that negligence."  Council of Co-owners
v. Whiting-Turner Contracting Co., 517 A.2d 336, 338 (Md. 1986).
The Whiting-Turner court also held that "where the dangerous
condition is discovered before it results in injury, an action
in negligence will lie for the recovery of the reasonable cost
of correcting the condition."  Id.

     Wal-Mart, as the occupant of the buildings, was foreseeably
subjected to the risk of personal injury because of the
allegedly dangerously defective masonry walls.  See id.  Thus,
there is an independent basis in the law for KBE's tort duty to
use due care in the design, inspection, and construction of the

Wal-Mart and Sam's Club stores in addition to its duty arising out of its contract with Wal-Mart.

ATC also argues that the indemnity claim should be dismissed because "KBE's liability is not vicarious, it is contractual and direct."  The Maryland Court of Special Appeals explained the active/passive negligence distinction as it relates to indemnification:

> Frequently occurring situations in which a right to implied indemnity between tortfeasors has been recognized include a tortfeasor liable (1) vicariously for the conduct of another, (2) for failing to discover a defect in a chattel supplied by another, (3) for failing to discover a defect in work performed by another, and (4) for failing to discover a dangerous condition on land created by another.

Max's of Camden Yards, 913 A.2d at 659.

As pleaded by KBE, KBE is potentially liable in tort to Wal-Mart for its failure to discover the defects in the walls built by Superus, its subcontractor.  The Court is not now determining whether there is a genuine factual question as to whether KBE's potential negligence was active or passive.  It suffices, for the present, to find that KBE has plausibly alleged that it was not actively negligent.

### 4.   Contribution

In Count V, KBE claims that it is entitled to contribution from ATC under the Maryland Uniform Contribution Act Among Joint

33

Tortfeasors because KBE paid more than its fair share of the common liability when it settled with Wal-Mart.

A statutory right of contribution among joint tortfeasors was created under the Maryland Uniform Contribution Among Joint Tort-Feasors Act.  Cts. & Jud. Proc. I § 3-1402.  The Act provides a right to contribution among joint tortfeasors on a pro rata basis even if there has been no judgment against them. Wassel v. Eglowsky, 399 F. Supp. 1330 (D. Md. 1975), aff'd, 542 F.2d 1235 (4th Cir. 1976), overruled in part on other grounds, Baker, Watts & Co. v. Miles & Stockbridge, 876 F.2d 1101 (4th Cir. 1989).

To recover for contribution under the Uniform Contribution Among Joint Tort-Feasors Act the plaintiff joint tortfeasor must show that: (1) there is a common liability to an injured person in tort, and (2) the joint tortfeasor has by payment discharged the common liability or has paid more than his or her pro rata share thereof.  See Richards v. Freeman, 179 F. Supp. 2d 556, 560-561 (D. Md. 2002).

As discussed above, KBE's has an independent tort duty to Wal-Mart, which satisfies the first contribution requirement. Although ATC argues that KBE did not "pay" for the remediation efforts, and rather, performed services, ATC has cited no case law to support its contention that the cost of remediation

services does not constitute "payment" for purposes of the Uniform Contribution Among Joint Tort-Feasors Act.

Although KBE argues that the 2011 Novation Agreements that supplemented the 2008 and 2009 Settlement Agreements are invalid for lack of consideration, KBE plausibly alleges that the Novation Agreements were executed pursuant to the further assurances clauses of the settlement agreements and are valid.

KBE's claim for contribution shall not be dismissed.


V.    CONCLUSION

For the foregoing reasons:

    1.    Defendant Massachusetts Bay Insurance Company's
          Motion for Summary Judgment and Request for
          Hearing [Document 77] is GRANTED.

    2.    Defendant ATC Associates Inc.'s Motion to Dismiss
          Second Amended Complaint [Document 78] is DENIED.

    3.    Plaintiff shall arrange a conference with all
          parties to discuss the scheduling of further
          proceedings herein.


SO ORDERED, on Friday, April 27, 2012.


                              _____/s/_____
                                    Marvin J. Garbis
                              United States District Judge